**IN THE UNITED STATES DISTRICT COURT FOR THE**
**WESTERN DISTRICT OF OKLAHOMA**

**JENNIFER IONE TIMMONS,** )
)
**Petitioner,** )
)
**v.** )        **No. CIV-17-86-R**
)
**DEBBIE ALDRIDGE,** )
)
**Respondent.** )

<u>**REPORT AND RECOMMENDATION**</u>

Petitioner Jennifer Timmons, a state prisoner appearing *pro se*, has filed a Petition

for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254, (ECF No. 1), challenging the

constitutionality of her state court conviction. Respondent has filed her Response to

Petition for Writ of Habeas Corpus, (ECF No. 9). For the reasons set forth below, it is

recommended that the Petition be **DENIED**.

## I.    BACKGROUND

On Friday, June 7, 2013, a dead body was found in a sleeping bag at the Meadow

Park Apartments. Transcript of the Jury Trial Proceedings had on the 11th day of February,

2015 Before the Honorable Ray C. Elliot, *State of Oklahoma v. Timmons*, Case No. CF-

2013-3561 (Okla. Co. Feb. 11, 2015) Vol. III at 73-80 (Trial TR. Vol. III). The following

Monday, the victim was identified as Jeffrey Lane. (Trial TR. Vol. III 82-84). Following an

investigation, Petitioner was arrested for the murder of Mr. Lane and a jury trial followed.

On February 12, 2015, the jury convicted Ms. Timmons of first degree murder. *State of*

*Oklahoma v. Timmons*, Case No. CF-2013-3561 (Okla. Co. Feb. 12, 2015) Vol. II at 144-

145 (Trial TR. Vol. II). On March 6, 2015, the trial court entered judgment accordingly.

(ECF No. 9-1). On direct appeal, the Oklahoma Court of Criminal Appeals (OCCA) affirmed the conviction on April 6, 2016. (ECF No. 9-5). On January 27, 2017, Ms. Timmons filed the instant action, seeking habeas relief on two grounds:

- Error in the denial of a motion to suppress a statement which Petitioner alleges was obtained in violation of *Miranda v. Arizona*[1] and subsequently resulted in a violation of her Fifth Amendment right to protection against self-incrimination and

- Three instances of ineffective assistance of trial counsel.

(ECF No. 1:4-8).

## II.  STANDARD OF REVIEW

The Antiterrorism and Effective Death Penalty Act of 1996 (the "AEDPA") governs this Court's power to grant habeas corpus relief. Under the AEDPA, the standard of review applicable to each claim depends upon how that claim was resolved by the state courts. *Alverson v. Workman,* 595 F.3d 1142, 1146 (10th Cir. 2010) (citing *Snow v. Sirmons,* 474 F.3d 693, 696 (10th Cir. 2007)). "When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." *Harrington v. Richter*, 562 U.S. 86, 98 (2011).

For claims adjudicated on the merits, "this [C]ourt may grant . . . habeas [relief] only if the [OCCA's] decision 'was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States' or 'resulted in a decision that was based on an unreasonable determination of the facts

---

[1] 384 U.S. 436 (1966).

in light of the evidence presented in the State court proceeding.'" *Hanson v. Sherrod*, 797 F.3d 810, 8214 (10th Cir. 2015) (citation omitted)). "It is the petitioner's burden to make this showing and it is a burden intentionally designed to be 'difficult to meet.'" *Owens v. Trammell*, 792 F.3d 1234, 1242 (10th Cir. 2015) (citation omitted). The deference embodied in § 2254(d) "reflects the view that habeas corpus is a 'guard against extreme malfunctions in the state criminal justice systems,' not a substitute for ordinary error correction through appeal." *Harrington,* at 102-03 (citation omitted).

This Court first determines "whether the petitioner's claim is based on clearly established federal law, focusing exclusively on Supreme Court decisions." *Hanson v. Sherrod*, 797 F.3d at 824. "A legal principle is 'clearly established' within the meaning of this provision only when it is embodied in a holding of [the United States Supreme Court.]" *Thaler v. Haynes*, 559 U.S. 43, 47 (2010). If clearly established federal law exists, this Court then considers whether the state court decision was contrary to or an unreasonable application of clearly established federal law. *See Owens,* 792 F.3d at 1242.

"A state court's decision is 'contrary to' clearly established federal law 'if the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or if the state court decides a case differently than the Court has on a set of materially indistinguishable facts.'" *Id.* (citations omitted). Notably, "[i]t is not enough that the state court decided an issue contrary to a lower federal court's conception of how the rule should be applied; the state court decision must be 'diametrically different' and 'mutually opposed' to the Supreme Court decision itself." *Id.* (citation omitted).

The "'unreasonable application' prong requires [the petitioner to prove] that the state court 'identified the correct governing legal principle from Supreme Court decisions but unreasonably applied that principle to the facts of the prisoner's case.'" *Id.* (citations and internal brackets omitted). On this point, "the relevant inquiry is not whether the state court's application of federal law was *incorrect*, but whether it was 'objectively unreasonable.'" *Id.* (citations omitted, emphasis in original). So, to qualify for habeas relief on this prong, a petitioner must show "there was no reasonable basis for the state court's determination." *Id.* at 1242-43 (citation omitted). "The question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable—a substantially higher threshold." *Schriro v. Landrigan,* 550 U.S. 465, 473 (2007).

In sum, "[u]nder § 2254(d), a habeas court must determine what arguments or theories supported . . . the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme] Court." *Harrington,* 562 U.S. at 101–02. Relief is warranted only "where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with [the Supreme] Court's precedents." *Id.* at 102.

Finally, a federal habeas court must "accept a state-court [factual] finding unless it was based on 'an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.'" *Davis v. Ayala*, 135 S. Ct. 2187, 2199 (2015). In other words, when the state appellate court makes a factual finding, the Court

presumes the determination to be correct; a petition can only rebut this presumption with clear and convincing evidence. *See id.* at 2199-22; *see also* 28 U.S.C. § 2254(e)(1).

If the state appellate court has not addressed the merits of a claim, the Court exercises its independent judgment. *See Littlejohn v. Trammell*, 704 F.3d 817, 825 (10th Cir. 2013) ("For federal habeas claims not adjudicated on the merits in state-court proceedings, we exercise our 'independent judgment[.]'" (citation omitted)). But "[a]*ny* state-court findings of fact *that bear upon the claim* are entitled to a presumption of correctness rebuttable only by 'clear and convincing evidence.'" *Hooks v. Workman*, 689 F.3d 1148, 1164 (10th Cir. 2012) (emphasis added) (quoting 28 U.S.C. § 2254(e)(1) (1996)).

## III. GROUND ONE

In Ground One, Petitioner alleges that the OCCA acted unreasonably in affirming the trial court's denial of motion to suppress a statement which Petitioner had made to police officials. (ECF No. 1:4-6). Petitioner alleges that the statement was obtained in violation of *Miranda v. Arizona* and the introduction of the statement violated her Fifth Amendment right to protection against self-incrimination. (ECF No. 1:4-6).

### A. Relevant Factual and Procedural Background

After identifying Mr. Lane as the murder victim, Detective John Homan and another officer went to the apartment complex where the deceased had been found and which Detective Homan had linked to the victim as his residence. (Trial TR. Vol. III 83). Upon their arrival, both officers spoke with the apartment manager, Josie Maldonado, who stated that Mr. Lane did not officially live at the complex, but she had seen him around

and he had requested a key to a particular apartment. (Trial TR. Vol. III 88). Detective Homan asked Ms. Maldonado for a key to the same apartment explaining that he was concerned for the welfare of anyone else who might be inside. (Trial TR. Vol. III 89-90).

Detective Homan approached the apartment with his partner Detective Bryn Carter. (Trial TR. Vol. III 91). Detective Homan knocked on the door and announced his presence, but no one responded. (Trial TR. Vol. III 91-92). Following the lack of response, Detective Homan used the key he had been given and unlocked the door. (Trial TR. Vol. III 92). Detective Homan went inside and called Petitioner's name. (Trial TR. Vol. III 93). Petitioner stepped out and Detective Homan led her outside to sit in a lawn chair while Detectives Homan and Carter did a cursory search of the apartment for more people. (Trial TR. Vol. III 93-94). Finding no one, the detectives left. (Trial TR. Vol. III 94). Detective Homan asked another officer to place Ms. Timmons in the back of a police car to take her downtown to be interviewed. (Trial TR. Vol. III 94).

In an interview room, Detective Homan asked Petitioner if she knew why she was there. (Trial TR. Vol. III 96). According to the Detective, Petitioner "said she was accused of killing her boyfriend." (Trial TR. Vol. III 96). At this point, the victim's identity had not been released to the public and no one had told Ms. Timmons that she had been accused of killing her boyfriend. (Trial TR. Vol. III 90, 96). Following Petitioner's statement, Detective Homan terminated the interview and obtained a search warrant for Petitioner's apartment. (Trial TR. 97).

Prior to trial, Petitioner filed a motion *in limine* seeking a hearing to establish whether a foundation existed for the admission at trial of any statements made by Ms.

Timmons—in particular whether she had been properly advised of her rights prior to speaking with Detective Homan after she had been taken to the police station. Original Record, Vol. I, *Oklahoma v. Timmons*, Case No. CF-2013-3561 (Okla. Co.) at 155-160 (O.R. ___). The trial court held a hearing and denied Petitioner's motion. (Trial TR. Vol. II at 103-122). At trial, Detective Homan testified regarding Petitioner's statement to him that she believed she was at the police department because she had been accused of killing her boyfriend. (Trial Tr. Vol. III at 96).

On direct appeal, Petitioner argued that the trial court had erred in denying the motion to suppress because she was "in custody" and had not been advised of her *Miranda* rights when she had made the inculpatory statement about being at the police station because she had been accused of killing her boyfriend. (ECF No. 9-2:10-14). The OCCA found that the trial court did not abuse its discretion in denying the motion to suppress. (ECF No. 9-5:3).

### B.    Clearly Established Law

The alleged error petitioner complains of is "trial error"—error which "occur[s] during the presentation of the case to the jury." *Brecht v. Abrahamson*, 507 U.S. 619, 629 (1993). This type of error is amenable to a harmless-error analysis because it "may . . . be quantitatively assessed in the context of other evidence presented in order to determine [the effect it had on the trial]." *Brecht v. Abrahamson*, 507 U.S. 619, 629 (1993) (brackets in original). Indeed, other courts have employed a harmless error analysis to challenges involving admission of testimony allegedly obtained in violation of *Miranda* which then also allegedly violated the accused's Fifth Amendment right against

self-incrimination. *See Neder v. United States,* 527 U.S. 1, 18, (1999) ("The erroneous admission of evidence in violation of the Fifth Amendment's guarantee against self-incrimination . . . [is] subject to harmless-error analysis under our cases." (citations omitted); *see also Arizona v. Fulminante,* 499 U.S. 279 (1991) (applying harmless error analysis to confession coerced in violation of Fifth Amendment); *United States v. Perdue,* 8 F.3d 1455, 1469 (10th Cir. 1993) (applying harmless error analysis to admission of statement made in violation of *Miranda).*

Under this standard, reversal would be required if the accused can demonstrate that the error "had substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, at 637. Stated another way, "habeas petitioners . . . are not entitled to habeas relief based on trial error unless they can establish that it resulted in 'actual prejudice.' " *Id.* Although the OCCA did not analyze the claim for harmlessness, this Court may do so without deciding whether, in fact, the statement had been obtained in violation of *Miranda. See Fry v. Plilar*, 551 U.S. 112, 121-122 (2007). ("We hold that in § 2254 proceedings a court must assess the prejudicial impact of constitutional error in a state-court criminal trial under the "substantial and injurious effect" standard set forth in *Brecht, supra*, whether or not the state appellate court recognized the error and reviewed it for harmlessness[.]")

### C.    Analysis

A harmless-error review inexorably leads to the conclusion that the admission of Ms. Timmons' statement that she was at the police station because "she was accused of killing her boyfriend" did not have a "substantial and injurious effect" on the trial.

After carefully reviewing the record, the undersigned concludes there was ample other evidence, besides Ms. Timmons' statement to Detective Homan, supporting Petitioner's conviction for first degree murder. Among other evidence, the jury heard testimony from various state witnesses and became aware of text messages from Petitioner which overwhelmingly pointed to her guilt.

For example, crime scene investigator Master Sergeant Christopher Click testified regarding his investigation of Petitioner's apartment. According to Sergeant Click, Bluestar chemical testing revealed the presence of blood in the apartment's living room hallway, bedroom, and bathroom. (Trial TR. Vol. III 166-188; State's Exhibit 42, *State of Oklahoma v. Timmons*, Case No. CF-2013-3561 (Okla. Co.) (State's Ex. ____). Sergeant Click also testified that he saw what appeared to be drag marks leading from a hallway, through a bathroom, and into the bedroom closet. (Trial TR. Vol. III 168, 182-184).

In the bedroom closet, Sergeant Click found a rolled up welcome mat with blood on it, a pair of women's jeans with blood on them, and a third bath mat with blood on it. (Trial Tr. Vol. III 177-178). In the living room, Sergeant Click found two large concentrated areas of blood—one on the living room floor which had been covered with two bath mats, and one on an ottoman that had been covered by a blanket. (Trial TR. Vol. III 173-174). Cutting the fabric from the ottoman, Detective Click testified that the padding inside was saturated with blood. (Trial TR. Vol. III 179). By the fireplace, Sergeant Click found blood spatter which he characterized as "medium velocity blood spatter," indicating that it had been cast off of an object. (Trial TR. Vol. III 174-176). Outside Petitioner's apartment, police officials confiscated an aluminum baseball bat that

had been partially hidden in some bushes. (Trial TR. Vol. III 100); State's Ex. No. 64. Chief Medical Examiner Eric Duval performed the autopsy on Mr. Lane and testified that his cause of death was blunt force trauma to the head and his injuries were consistent with having been caused by the use of a cylindrical-type object. (Trial TR. Vol. III 53, 54, 66, 68).

Detective Click gathered blood swabs from all of the bloody areas and sent them to be tested by forensic scientist Elaine Taylor. (Trial TR. Vol. III 231-232; State's Exhibit 42; 94A & 95). For testing and comparison purposes, Ms. Taylor had a known sample of Mr. Lane's blood. (Trial TR. Vol. III 237). Ms. Taylor performed the DNA analysis on the blood swabs that had been collected from Petitioner's apartment and identified Mr. Lane as the source of DNA which was present on the women's jeans found in Petitioner's bedroom, the blood on the apartment living room floor, the wall by the fireplace, and the blood from the ottoman fabric. (Trial TR. Vol. III 229243-246, State's Ex. 94B).

Crime Scene investigators also confiscated a cell phone that was found inside Petitioner's apartment that was subsequently processed and downloaded. (Trial TR. Vol. III 103-105). Detective Carter obtained records for the cell phone and determined that it was owned by Petitioner. (Trial TR. Vol. III 267). Detective Carter was also able to determine that text messages had originated from Petitioner's phone to a phone belonging to Troy Colbert and a phone belonging to Rebecca Cizek. (Trial TR. Vol. III 269-270). On May 20, 2013, text messages from Petitioner's phone to Ms. Cizek read:

- "I told [my dad] that I had a party and Jeff and some bitch was feeling each other up and making out in my living room while me and two other people were out side. [sic]."

- "Yea, so Jeff is with that bitch now. Jeff and that girl was talking and he was talking shit about me to her. And when I do see that bitch, Ima fuck her and jeff up."

- "So I blocked her from my fb and I to[ld] Aleen to tell she is not welcome over here anymore…I hope they no [sic] that I have a meta [sic] bat in my closet."

- "So if I do see him or her they will be getting their ass kicked."

- "So God better get to them before I do."

- "He's going to pay."

(State's Ex. 98).

On May 23rd and 24th, 2013, text messages from Petitioner's phone to Mr. Colbert read:

- "Hey I told my mom what Jeff and Keisha did in my apartment. Why didn't you kick them out?"

- "Ya know, I saw Keisha and Jeff make out and the bitch gave him head. The reason I didn't do anything is because I was drunk and I do have a bat in my closet. Am I a bad person for that?"

- "I should of fucked both them up."

(State's Ex. 98).

Finally, the jury heard testimony from the victim's mother and two acquaintances of Petitioner who had personally witnessed Petitioner exhibit violence towards Mr. Lane. Goldie Lane, the victim's mother, testified that at a barbeque in 2011, she saw Ms. Timmons slap Mr. Lane in the face. (Trial TR. Vol. II 157). In 2012, Ms. Lane testified that her son and Ms. Timmons had been alone in a bedroom and when he came out, he had "blood gushing out of his eye and . . . scratches on his face." (Trial TR. Vol. II 158).

Sometime in 2011 or 2012, Ms. Lane stated that she heard Petitioner threaten to kill Mr. Lane because he had been talking to someone else on the phone. (Trial TR. Vol. II 160).

Wesley Stark owned a business across the street from Petitioner's residence and he had become acquainted with Ms. Timmons and Mr. Lane. (Trial TR. Vol. II 182-183). Mr. Stark testified that in 2011, Mr. Lane had come running across the street into Mr. Stark's shop with "marks all over his entire body" and bleeding from his nose and mouth. (Trial TR. Vol. II 183-184). According to Mr. Lane, Ms. Timmons had attacked him and caused the injuries. (Trial TR. Vol. II 183-184). Later that day, after Mr. Lane went back to Petitioner's apartment to retrieve personal items, he went back to Mr. Stark's shop with additional injuries which Mr. Lane stated had been caused by Ms. Timmons. (Trial TR. Vol. II 185). According to Mr. Stark, Mr. Lane had a "big knot" on the back of his head where Mr. Lane stated that Petitioner had hit him with a scale and a deep bite mark on one of his shoulders. (Trial TR. Vol. II 185-186).

Finally, a friend of Mr. Lane and Ms. Timmons, Troy Colbert, testified regarding an incident of domestic violence involving Petitioner and Mr. Lane. According to Mr. Colbert, Mr. Lane exited a room where he had been alone with Ms. Timmons, arguing, and told Mr. Colbert that Petitioner had "hit him in the ear." (Trial TR. Vol. II 207-208). According to Mr. Colbert, Mr. Lane's ear had been cut so severely that Mr. Colbert thought it was going to fall off. (Trial TR. Vol. II 208, 224).

Highly incriminating and overwhelming evidence existed which pointed to the Petitioner as having killed Mr. Lane. Petitioner had been violent toward Mr. Lane in the past, and had threatened to "fuck [him] up" because he had been seeing another woman.

In the same conversation where Ms. Timmons had threatened Mr. Lane, she admitted that she had a metal bat in her closet and stated that if she saw Mr. Lane, he was going to "get[] [his] ass kicked." Mr. Lane's blood was found all over Petitioner's apartment and the Medical Examiner testified that Mr. Lane had died as a result of blunt force trauma to the head, exhibiting injuries consistent with having been caused by a cylindrical object.

Ms. Timmons argues that her statement to Detective Homan that she had been accused of killing her boyfriend had been illegally obtained and at trial the introduction of the statement had violated her Fifth Amendment right to protection against self-incrimination. But in light of other overwhelming evidence, Ms. Timmons' statement would have made little difference in the jury's assessment of the evidence supporting the murder conviction. Accordingly, the Court should conclude that any error which may have existed in admitting the statement was harmless and did not have a "substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, at 637. Thus, Ms. Timmons is not entitled to habeas relief on Ground One.

## IV.  GROUND TWO

In Ground Two, Ms. Timmons alleges that her trial counsel was ineffective for failing to:

- Introduce more evidence at the motion to suppress her statement to police,

- Request a jury instruction on the lesser included offense of second-degree murder, and

- Object to two instances of prosecutorial misconduct.

(ECF No. 1:7-8). The OCCA denied these claims on direct appeal. (ECF No. 9-5:4-6). The Court should conclude that the OCCA's determination was consistent with Supreme Court precedent.

### A.  Clearly Established Law

Under clearly established law, Petitioner must demonstrate that her attorney's performance was deficient and prejudicial. *See Strickland v. Washington*, 466 U.S. 690-691 (1984). The court will only consider an attorney's performance "deficient" if it falls "outside the range of professionally competent assistance." *Id.* at 690. "[P]rejudice" involves "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. Because the OCCA adjudicated the ineffective assistance of counsel claims on the merits, they are entitled to AEDPA deference. And on such claims "AEDPA review is doubly deferential because counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment . . ." *Woods v. Etherton*, 136 S. Ct. 1149, 1151 (2016) (internal quotation marks omitted). "In such circumstances, federal courts are to afford both the state court and the defense attorney the benefit of the doubt." *Id.* (internal quotation marks omitted).

### B.  No Ineffective Assistance of Counsel for Failing to Introduce More Evidence at the Motion to Suppress Hearing

Prior to trial, the court held a hearing to determine the admissibility of a statement made by Petitioner to Detective Homan that she was at the police station because she had been accused of killing her boyfriend. (Trial TR. Vol. III 102-122). As discussed, the Petitioner argues that she was "in custody" at the time the statement had been obtained

and not been read her *Miranda* rights. (ECF No. 1:4-6). According to Ms. Timmons, Petitioner argues that her trial attorney erred in failing to present key details surrounding her "custody" status at the hearing on the motion to suppress. (ECF No. 1:7-8).

Previously, the undersigned concluded that under *Brecht v. Abrahamson*, 507 U.S. 619, 629 (1993), any error which may have had occurred as a result of admitting Petitioner's statement was harmless in light of the overwhelming evidence which pointed to Petitioner's guilt. *See supra*. In light of that finding, the Court should conclude that even if Petitioner's counsel had erred in failing to present certain evidence related to Petitioner's "custody" status at the pre-trial hearing, no prejudice would have resulted as a result of the statement's admission. Because the standard under *Brecht* and *Strickland* require the same showing of prejudice, no additional analysis is necessary. *See Byrd v. Workman*, 645 F.3d 1159, 1167, n. 9 (10th Cir. 2011) ("*Strickland* prejudice and *Brecht* harmless error are essentially the same standard, and . . . a second prejudice analysis under *Brecht[ ]* is therefore unnecessary when considering ineffective-assistance-of-counsel claims.") (citing *Hall v. Vasbinder,* 563 F.3d 222, 236 (6th Cir. 2009) ("The prejudice prong of the ineffective assistance analysis subsumes the *Brecht* harmless-error review."); *Smith v. Dixon,* 14 F.3d 956, 974, 976 (4th Cir.1994) *(en banc)* (concluding that the prejudice inquiry under *Strickland* is essentially the same as the harmless-error inquiry under *Brecht*.)) (internal quotation marks omitted).

### C.    No Ineffective Assistance of Counsel for Failing to Request a Lesser-Included Instruction

Ms. Timmons argues that her trial attorney was ineffective for failing to request a jury instruction on the lesser-included offense of second-degree murder. (ECF No. 1:8).

According to Petitioner, the evidence at trial related to her domestic abuse against Mr. Lane supported an instruction for second-degree murder, which required a finding that she had acted with a "depraved mind" rather than "malice aforethought" which is required for first-degree murder. (ECF No. 1:8); *see* 21 O.S. §§ 701.7 (first-degree murder) & 701.8 (second degree murder).

On direct appeal, the OCCA stated: "Timmons' defense was actual innocence. Where a defendant claims she was actually innocent of the crime, she is not entitled to lesser included offense instructions." (ECF No. 9-5:3). The OCCA further found that trial counsel's decision to not request an instruction on the lesser-included offense was a "strategic decision" which the court would not second-guess. (ECF No. 9-5:5). The OCCA's conclusion was consistent with Supreme Court precedent.

As noted by the United States Supreme Court, there is a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland,* 466 U.S. at 689. This general presumption of objective reasonableness requires a petitioner to "overcome the presumption that, under all the circumstances, the challenged action "*might* be considered sound trial strategy." *Id.*; *see Gonzales v. McKune,* 247 F.3d 1066, 1072 (10th Cir. 2001) (explaining that ineffective assistance of counsel claimant must "overcome the presumption that defense counsel's actions were sound trial strategy"). However, in discussing *Strickland's* first prong, the Supreme Court has also stated that, "[t]he relevant question is not whether counsel's choices were strategic, but whether they were reasonable." *Roe v. Flores-Ortega*, 528 U.S. 470, 481 (2000).

Here, Ms. Timmons did not testify at trial, thus her entire defense was presented by her attorney in opening statements and closing arguments. There, Petitioner's attorney argued that her client was actually innocent of the crime, not that she had acted with a "depraved mind" in killing Mr. Lane. (Trial Tr. Vol. II 142-148; Transcript of the Jury Trial Proceedings had on the 12th day of February, 2015 Before the Honorable Ray C. Elliot, *State of Oklahoma v. Timmons*, Case No. CF-2013-3561 (Okla. Co. Feb. 11, 2015) Vol. IV at 105-143). An instruction which required proof that Ms. Timmons had acted with a "depraved mind" would have directly conflicted with Petitioner's defense that she was actually innocent of the crime. Thus, the Court should conclude that trial counsel's decision to not request the instruction was a reasonable trial strategy. The OCCA reached this conclusion and that decision was consistent with Supreme Court precedent.

### D. No Ineffective Assistance of Counsel for Failing to Object to Prosecutor's Statements or Introduction of Photographs

Ms. Timmons alleges her attorney was ineffective for failing to object to: (1) comments made by the prosecutor during opening statement regarding the victim's mother losing a son and his two children losing their father and (2) the prosecutor's comparison of pre- and post-mortem photographs of the victim to the jury. (ECF No. 1:8). According to Petitioner, these comments and the introduction of photographs improperly elicited sympathy from the jury. (ECF No. 1:8).

On direct appeal, the OCCA considered Petitioner's underlying claim of prosecutorial misconduct as well as Petitioner's claims that her attorney was ineffective for failing to object to the statements and pictures. The OCCA rejected both claims, stating:

We find in Proposition III that no prosecutorial misconduct affected Timmons' trial. She did not object to any of the comments and we review for plain error. Both parties have wide latitude to argue the evidence and inferences from it. We will not grant relief for error unless a grossly unwarranted argument affects the defendant's rights, prejudicing him to the point he is deprived of a fair trial. Timmons first complains that the prosecutors invoked sympathy for the victim in opening statement. Opening statements are intended to tell jurors what evidence the state intends to present. The State did in fact present the evidence in question, and Timmons did not object to it. She fails to show how she was prejudiced by these comments. She also argues that the prosecutor used properly admitted exhibits to argue the evidence at trial. There is no plain error and this proposition is denied.

We find in Proposition IV that trial counsel was not ineffective for failing to object to evidence and argument. Timmons must show counsel's performance was deficient, and that the deficient performance was prejudicial. . . . Timmons states, without specific argument, that there is a reasonable probability that the outcome of the trial would have been different but for counsel's omissions. The record does not support that claim. Timmons cannot show she was prejudiced by trial counsel's acts and omissions, and this proposition is denied.

(ECF No. 9-5:4-6) (internal citations omitted). The OCCA's decision was reasonable and consistent with Supreme Court precedent.

To evaluate Ms. Timmons' claim that her attorney was ineffective for failing to object to certain comments and pictures introduced by the prosecutor, she would have to show that the prosecutor's remarks and actions "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Donnelly v. DeChristoforo,* 416 U.S. 637, 643, 645 (1974). The OCCA applied this standard and concluded that Ms. Timmons was not prejudiced by the challenged remarks or the introduction of photographs. (ECF No. 9-5:4-6). The undersigned agrees. To determine whether a trial is rendered fundamentally unfair, the court examines the entire proceeding, "including the strength of the evidence against the petitioner . . . as well as [a]ny cautionary steps-

such as instructions to the jury-offered by the court to counteract improper remarks."
*Bland v. Sirmons,* 459 F.3d 999, 1024 (10th Cir. 2006) (alteration in original) (internal quotation marks omitted). "'[I]t is not enough that the prosecutors' remarks were undesirable or even universally condemned.'" *Id.* (alteration in original) (quoting *Darden v. Wainwright,* 477 U.S. 168, 181 (1986)). "The ultimate question is whether the jury was able to fairly judge the evidence in light of the prosecutors; conduct." *Id.*

Here, The OCCA reasonably concluded that no plain error existed in the prosecutor's comments regarding the victim's mother losing a son and the victim's children losing their father. "The prosecutor is allowed a reasonable amount of latitude in drawing inferences from the evidence . . . ." *Duvall v. Reynolds,* 139 F.3d 768, 795 (10th Cir. 1998) (citation omitted). Indeed, the purpose of an opening statement is to state what evidence will be presented. *United States v. Dinitz*, 424 U.S. 600, 612 (1976). It is undisputed that Mr. Lane died and indeed left his mother without a son and his children without a father.

Likewise, the OCCA reasonably concluded that the introduction of pre-mortem and post-mortem photographs during the State's closing argument was not error. The post-mortem photograph, while undoubtedly gruesome, was relevant because it "depict[ed] the extent of [Mr. Lane's] injuries and [was] probative of intent to kill." *Williams v. Trammell*, 782 F.3d 1184, 1203 (10th Cir. 2015) (no error in admission of post-mortem photographs of the victim).

Finally, in light of the overwhelming evidence supporting Ms. Timmons' guilt, *see supra*, and the fact that the jury was instructed to "not let sympathy, sentiment or

prejudice enter into [their] deliberations,"[2] the undersigned agrees with the OCCA's conclusion that the challenged statements and introduction of photographs did not result in a fundamentally unfair trial. *See Bland v. Sirmons,* 459 F.3d 999, 1024 (10th Cir. 2006).

Because the improper remarks and admission of photographs did not result in a fundamentally unfair trial, trial counsel was not objectively unreasonable for failing to object to either. *See Neill v. Gibson*, 278 F.3d 1044, 1062 (10th Cir. 2001) (rejecting claim that appellate counsel had been ineffective for failing to assert trial counsel's failure to object to instances of alleged prosecutorial misconduct when the comments had not rendered the trial fundamentally unfair); *Cole v. Workman*, No. 08-CV-0328-CVE-PJC, 2011 WL 3862143, at *40 (N.D. Okla. Sept. 1, 2011) ("Because the prosecutor's improper statements did not change the result of the proceedings, [petitioner] cannot establish he was prejudiced by his counsel's failure to object to them. Thus, [petitioner's] ineffective assistance of counsel claim fails."). Accordingly, Petitioner is not entitled to habeas relief based on counsel's failure to object to the alleged instances of prosecutorial misconduct.

## V.     RECOMMENDATION

It is recommended that Ms. Timmons' Petition for Writ of Habeas Corpus be **DENIED**.

## VI.     NOTICE OF RIGHT TO OBJECT

The parties are advised of their right to file an objection to this Report and Recommendation with the Clerk of this Court by **June 12, 2017**, in accordance with 28 U.S.C. § 636 and Fed. R. Civ. P. 72. The parties are further advised that failure to make

---

[2]   O.R. 294.

timely objection to this Report and Recommendation waives the right to appellate review of both factual and legal issues contained herein. *Casanova v. Ulibarri*, 595 F.3d 1120, 1123 (10th Cir. 2010).

## VII.   STATUS OF REFERRAL

This Report and Recommendation terminates the referral by the District Judge in this matter.

ENTERED on May 24, 2017.

SHON T. ERWIN
UNITED STATES MAGISTRATE JUDGE